FILED
07/09/2019
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 27, 2018 Session

**STATE OF TENNESSEE v. QUENTIN LOVE**

**Appeal from the Criminal Court for Knox County**
**No. 104022   G. Scott Green, Judge**

_____

**No. E2017-02431-CCA-R3-CD**
_____

Defendant, Quentin Love, was indicted by the Knox County Grand Jury for felony murder during the attempt to perpetrate burglary, felony murder during the attempt to perpetrate theft, felony murder during the attempt to perpetrate robbery, especially aggravated burglary, especially aggravated robbery, employment of a firearm during a dangerous felony, unlawful possession of a weapon by a person having been convicted of a felony involving the use of force, and unlawful possession of a weapon after having been convicted of a felony drug offense.  Defendant proceeded to a jury trial.  At the close of the State's proof, the trial court granted Defendant's motion for judgment of acquittal as to especially aggravated robbery and reduced the charge to attempted especially aggravated robbery.  The jury convicted Defendant as charged.  The trial court merged the felony murder convictions into a single count of felony murder during the attempt to perpetrate burglary.  The trial court also merged the unlawful possession of a weapon convictions into a single count of unlawful possession of a weapon by a convicted felon.  The trial court sentenced Defendant to life imprisonment for his felony murder conviction.  Defendant received concurrent sentences of 20 years each for his especially aggravated burglary and attempted especially aggravated robbery convictions, to be served concurrently with his life sentence.  Defendant was also sentenced to ten years for his unlawful possession of a weapon conviction and ten years for his employment of a firearm conviction, to be served consecutively to each other and consecutively to his life sentence, for a total effective sentence of life plus 20 years' imprisonment.  In this appeal as of right, Defendant contends: 1) that the trial court erred in denying his motion for mistrial; 2) that the trial court erred by instructing the jury on flight; and 3) that the evidence is insufficient to sustain his convictions.  Having reviewed the entire record and the briefs of the parties, we affirm the judgments of the trial court.  However, we remand this case to the trial court for entry of judgments in counts 2, 3, and 8, pursuant to *State v. Berry*, 503 S.W. 360 (Tenn. 2015), as well as entry of an amended judgment in count 6 to accurately reflect the offense for which Defendant was convicted.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Joshua Hedrick, Knoxville, Tennessee, for the appellant, Quentin Love.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme P. Allen, District Attorney General; and Kevin Allen, Assistant District Attorney, for the appellee, State of Tennessee.

**OPINION**

*Facts*

On October 27, 2013, Jennifer Whitsell called both Defendant, whom she knew as "C," and subsequently the victim, John Smith, about purchasing drugs. Ms. Whitsell arranged to meet Defendant down the street from her house. She saw Defendant drive past their meeting spot and called him to ask where he was going. Defendant told her he was going to get gas. Ms. Whitsell walked to a nearby Pilot gas station to meet Defendant. Defendant told Ms. Whitesell that he did not have any drugs, so she called the victim to arrange to buy from him instead and asked Defendant to drive her to the victim's house.

Defendant and Ms. Whitsell left the Pilot station at 10:03 p.m. As they drove to the victim's house, Defendant asked Ms. Whitsell "random questions" about the victim, like "how big he was" and "what he looked like." They arrived at the victim's apartment complex at approximately 10:23 p.m., and Ms. Whitsell directed Defendant to park one street away from the victim's apartment because, she explained, the victim did not want people to know where he lived. Ms. Whitsell testified that she had "a little more than $20." She got out of the car and walked to the victim's apartment. Defendant was supposed to wait in his car.

The victim opened the back door and let Ms. Whitsell into the kitchen. She gave the victim her money, and he gave her crack cocaine. She then walked towards the door, and the victim stopped her and went to the door. When the victim opened the door, Defendant was standing there with a gun pointed at the victim. The victim "grabbed the gun and tried to push [Defendant] out and they started fighting." The two men were struggling on the steps outside the door, and Ms. Whitsell heard gunfire. She ran towards the front door of the apartment and heard "four or five" more gunshots. She ran outside and began walking towards the main road. She was stopped by a police officer who

asked her if she had seen what happened, and Ms. Whitsell told him that she had not. Ms. Whitsell was transported to the police station for an interview. Ms. Whitsell testified that she told police that she did not know who shot and killed the victim because she "was scared" and "didn't want to have anything to do with it."

Ms. Whitsell eventually told police that she had been at the Pilot gas station with the person who shot the victim. She told police that the suspect had driven past her and parked, that she walked to the gas station to meet him, that she pumped gas for him, and that he went inside the store, came back out of the store, and they left together in the suspect's vehicle.

Lloyd Cabe testified that he was repairing a car at a nearby apartment when he heard gunshots and saw a man wearing a hoodie run to a red vehicle and drive away with the headlights off. The victim's neighbors began calling 911 at 10:34 p.m. The callers reported that the shooter was a black male wearing a black hoodie; that the shooter left the scene in a red vehicle with the headlights turned off; and that a second suspect ran toward the interstate. Responding officers found the victim lying on the ground surrounded by people attempting to perform first aid. Officers found a $20 bill on the ground near the victim. Security camera footage from the victim's apartment showed Ms. Whitsell walking to the front of the residence at 10:30 p.m. and entering the apartment through the back door at 10:31 p.m. Thirty-five seconds later, the cameras captured a male walking into view. The male had facial hair and appeared to be wearing a hoodie with the hood up, a long shirt, and dark pants. At 10:34 p.m., the cameras captured the sound of fighting and then a gunshot. Two people drifted in and out of view of the camera, and another gunshot can be heard. The video then showed a man running away.

Security video from the Pilot gas station showed an orange Dodge Avenger pull up to the gas pump at 9:54 p.m. The driver exited the vehicle and walked out of camera view. Ms. Whitsell walked into camera view and began to pump gas into the vehicle. The video showed that the vehicle had paper in the front windshield and a yellow pine tree deodorizer hanging from the rearview mirror. The driver of the vehicle was wearing jeans, a dark hoodie, and a t-shirt shirt that was visible below the hoodie around his waist. Police later located the same vehicle in the security video at the Montgomery Village apartment complex. Police identified Elizabeth Parsley as the owner of the vehicle.

Elizabeth Parsley, Defendant's girlfriend, testified that she and Defendant had traded vehicles on the day of the shooting. Defendant called her on the morning of October 28, 2013, and told her to get her car from Montgomery Village because something was wrong with it. Ms. Parsley asked Defendant what he would drive, and

- 3 -

Defendant responded, "I'm not going to be driving." She asked Defendant what was going on, and Defendant said that he could not talk about it.

The police arrived at Ms. Parsley's residence as she was getting ready to leave and advised her that her car was involved in a homicide investigation. Ms. Parsley told police that Defendant had been in possession of her vehicle for two months (somewhat contradicting her testimony), and she consented to a search of her vehicle. During a search of the vehicle, police found a funeral program on the driver's side dash, a pack of L&M cigarettes in the center console, and a yellow tree-shaped air freshener on the rearview mirror. Ms. Parsley testified that she told Defendant later that day that the police had seized her car in a murder investigation, and Defendant told her that he did not do anything wrong.

Tiffany Kinser testified that she knew Defendant as "Crush." She testified that she saw Defendant at his cousin Nneka Ruff's apartment in Western Heights on October 28, 2013. She testified that Defendant appeared as if "he had been in a very serious fight. He had a very bad cut on his bottom lip." Defendant told Ms. Kinser that he "hit a lick and it went sour," which Ms. Kinser testified meant that Defendant had committed a robbery. Ms. Kinser bought Defendant liquid bandage for his lip and offered to give him money and get him a hotel room, but Defendant declined because "[h]e was too paranoid to leave the apartment."

The medical examiner, Dr. Darinka Mileusnic-Polchan, testified that the victim suffered "four main gunshot wounds" and a "firearm injury" on the victim's forehead that did not result in a gunshot wound, but rather a deposit of gunpowder residue. She testified that "at least five shots [were] fired at the victim." Four bullets struck the victim. The victim was within close range of the shooter. The fatal bullet entered the victim's back and lodged in his heart. Dr. Mileusnic-Polchan testified that "there [wa]s very dense gunpowder stippling or tattooing around the [fatal] wound, meaning that the victim and the shooter [we]re very close to each other . . . ."

Jason Branner testified for the defense. He testified that Defendant was at Nneka Ruff's apartment when he arrived at 3:30 p.m. on October 27, 2013. Mr. Branner testified that Defendant left at approximately 9:30 p.m. Defendant stated that he was going to pick up someone. After Defendant left, Mr. Branner and Brandy Martin walked to Jimmy's Market. They left the market around 10:00 p.m. and saw Defendant driving an orange car. Defendant had a white female passenger in his car. Defendant picked them up, dropped the woman off nearby, and returned to Ms. Ruff's apartment at around 10:15 p.m. Mr. Branner testified that he left Ms. Ruff's apartment at 10:50 p.m. to meet his 11:00 p.m. curfew, and Defendant left at the same time. Mr. Branner did not recall seeing Ms. Kinser at Ms. Ruff's apartment or seeing a cut on Defendant's lip. On cross-

examination, Mr. Branner conceded that he did not come forward as an alibi until shortly before Defendant's trial. He testified that he "barely" knew Defendant. Mr. Branner acknowledged that he had prior convictions.

Brandy Martin testified that Defendant arrived at Ms. Ruff's apartment with Mr. Branner at around noon on October 27, 2013. She testified that he left sometime between 9:00 and 9:30 p.m. Ms. Martin testified that she and Mr. Branner walked to Jimmy's Market just before it closed at 10:00 p.m. Defendant stopped and picked them up on their way back to Ms. Ruff's apartment. Defendant had a white, female passenger, who he dropped off at the same time. Ms. Martin acknowledged that she did not come forward as an alibi until three weeks before Defendant's trial.

Defendant testified that he arrived at Ms. Ruff's apartment around 2:00 p.m. Defendant left Ms. Ruff's apartment to meet Jennifer Whitsell at the Pilot station. Defendant testified that he sold Ms. Whitsell $40 worth of crack cocaine, and then drove her to Western Heights. He testified that he saw Ms. Martin and Mr. Branner leaving the store, and he picked them up. Defendant dropped off Ms. Whitsell at 10:15 p.m., and then returned to Ms. Ruff's apartment. He left Ms. Ruff's apartment at 10:50 p.m., when Mr. Branner left.

Defendant denied that he spent the night at Ms. Stewart's house. He testified that he parked Ms. Parsley's car, an orange Avenger, at Montgomery Village in the early morning hours on October 28, 2013. He testified that the vehicle had "been having starter problems." He then saw his friend Tracy and rode with her to her house, where he spent the night. Defendant denied that he went to the victim's apartment. Defendant acknowledged that he made several phone calls from jail to Ms. Ruff, asking her "to get in touch with [his] investigator." Defendant denied that he directed any witness how to testify. He testified that he "didn't know nothing [sic] about a homicide until the day" he was arrested on November 12, 2013. Defendant testified that he "heard somebody was looking for [him]," but he "didn't know the police w[ere] looking for [him]." Defendant acknowledged that he knew he was "wanted for questioning." At the time of his arrest, Defendant was in a motel room that was rented by another person whose name Defendant could not recall. Defendant testified that he "went there to take a shower" and that he did not have a permanent residence, but that he "couch hop[ped]."

Michael Bone, Jason Branner's parole officer, testified on rebuttal for the State. He testified that on October 27, 2013, Mr. Branner was not under any curfew restrictions, rebutting the testimony of Jason Branner that he had a curfew. The State also called as a rebuttal witness, Jamal Murphy, the owner of Jimmy's Market. He testified that the store was open until midnight on Sundays in October, 2013, rebutting the testimony of Brandy Martin that the store closed at 10:00 p.m.

*Analysis*

*Motion for mistrial*

Defendant contends that the trial court erred in refusing to grant a mistrial after Tiffany Kinser called him a robber during her testimony. The State responds that the trial court properly denied Defendant's motion for mistrial.

At trial, Ms. Kinser testified that she knew Defendant. The prosecutor asked Ms. Kinser, "what did you know him as?" Ms. Kinser responded, "[a] robber." Defense counsel objected, and the prosecutor said, "I just told her that I was asking her about the nickname. That she knew him as Crush. I told her outside not to talk about her robbing people with him." The trial court gave the following curative instruction to the jury immediately following Ms. Kinser's answer:

> Ladies and gentlemen, sometimes we as human beings just blurt out things that are non-responsive. You are to disregard that last comment. Understood? You are not to place any significance on the comment that was just made.
>
> . . . .
>
> Ladies and gentlemen, what somebody may have heard about somebody, we don't try cases in this courtroom on that, we try cases on facts, not insinuations or suppositions, so you are to disregard what this witness just stated. Does everyone understand that?

The trial court denied Defendant's motion for mistrial during a jury-out hearing. A trial court's decision to grant or deny a motion for mistrial is within the providence of that court. An appellate court will only disturb a trial court's ruling on the motion when there has been an abuse of discretion by the trial court. *State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). A trial court abuses its discretion when it "applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

A trial court should declare a mistrial "only when there is a 'manifest necessity.'" *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996) (quoting *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result

if it did.'" *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004) (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). A mistrial should be declared "to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *Williams*, 929 S.W.2d at 388. The defendant bears the burden of establishing that there was a manifest necessity for a mistrial. *Id*.

In determining whether a mistrial is necessary after a witness has testified about a defendant's alleged prior bad acts, this court has often considered: "(1) whether the improper testimony resulted from questioning by the state, rather than having been a gratuitous declaration, (2) the relative strength or weakness of the state's proof, and (3) whether the trial court promptly gave a curative instruction." *State v. Demetrius Homes*, No. E2000-02263-CCA-R3-CD, 2001 WL 1538517, at *4 (Tenn. Crim. App. Nov. 30, 2001) (citing *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993); *State v. William Dotson*, No. 03C01-9803-CC-00105, 1999 WL 357327, at *4 (Tenn. Crim. App. June 4, 1999)).

We conclude that the trial court did not abuse its discretion in refusing to declare a mistrial. The State did not elicit the testimony; instead, the witness volunteered that she knew Defendant as a robber, even after the prosecutor had instructed her not to mention that subject. The trial court gave the jury a curative instruction. Jurors are presumed to follow the instructions of the trial court. *State v. Reid*, 164 S.W.3d 286, 342 (Tenn. 2005). The State's proof against Defendant was strong in that Ms. Whitsell's testimony was corroborated by the Pilot security camera footage and the security camera footage from Defendant's home, and Defendant's statement to Ms. Kinser. Accordingly, we conclude that the trial court did not err in refusing to grant a mistrial in this case. Defendant is not entitled to relief on this issue.

*Flight instruction*

Defendant contends that the trial court erred by instructing the jury on flight because the evidence was insufficient to support the instruction. Specifically, Defendant asserts that the evidence failed to show that he was hiding out. The State responds that the evidence supported the instruction. We agree with the State.

A defendant in a criminal case "has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). A jury charge should contain no statement which is inaccurate, inapplicable, or which might tend to confuse the jury. *State v. Hatcher*, 310 S.W.3d 788, 812 (Tenn. 2010). A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 994 S.W.2d 346, 352

(Tenn. 1997).  Whether a jury instruction is required by the facts of a particular case is a mixed question of law and fact.  *State v. Hawkins*, 406 S.W.3d 121, 128 (Tenn. 2013).  The question of whether a jury instruction should have been given is therefore reviewed de novo with no presumption of correctness.  *Id*.

"In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction."  *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004).  Sufficient evidence requires both a leaving of the scene and a subsequent act indicative of an intent to flee:

> The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within a jurisdiction.  However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

*State v. Dorantes*, 331 S.W.3d 370, 388 n.16 (Tenn. 2011).  The State may satisfy the subsequent hiding requirement by introducing evidence from which a jury might infer that the defendant committed the act of hiding out, evading, or concealment within the community.  *State v. Wilks*, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim. App. Nov. 22, 1999), *perm. app. denied* (Tenn. Apr. 24, 2000).  "Evidence of flight to avoid arrest may be rebutted by a credible explanation of some motive other than guilt, but the conclusion to be drawn from such evidence is for the jury upon proper instructions from the trial court."  *Hall v. State*, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979).  A brief evasion of authorities is sufficient to support the giving of the flight instruction.  *State v. Payton*, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989).

At trial, defense counsel objected to a flight instruction, and the following discussion was had:

> THE COURT:  [Y]our objection has been previously noted, [defense counsel], to the inclusion of flight, I think it fits under the facts whether they believe he fled is a question of fact.  However, under – since the State has proven that he was found in a motel while in Knoxville under an assumed name.
>
> [DEFENSE COUNSEL]:  Well, the room was rented under someone else's name.  There's no evidence to suggest that [Defendant] caused that room to be rented under someone else's name as opposed to simply being in the room –

- 8 -

THE COURT: I'm going to charge it. I think it fits under the facts of this case, it's – you can argue very effectively, I'm sure, that there's no evidence of flight here but – and I'm sure that when [Defendant] testifies that will be a matter that will be touched upon by both of you, but for purposes of the proof that I've heard so far I think flight is an appropriate instruction.

[DEFENSE COUNSEL]: Yes, your honor.

The State presented evidence that Defendant fled the scene of the shooting and drove away with his headlights off. He then left the vehicle at Montgomery Village and rode to another location with a friend. Tiffany Kinser testified that Defendant declined her offer to give Defendant money for a hotel room because he "was too paranoid to leave [Nneka Ruff's] apartment." Elizabeth Parsley testified that she informed Defendant on October 28, 2013, that the police seized her vehicle in a murder investigation. When Defendant was arrested on November 12, 2013, he had been staying at a motel room that had been rented in someone else's name.

This evidence is sufficient to prove that Defendant fled the scene and subsequently evaded police. Defendant was free to rebut the flight theory by offering his explanation, and the jury was free to reject Defendant's explanation. The jury instruction on flight was proper. Defendant is not entitled to relief on this issue.

*Sufficiency of the evidence*

Defendant contends that the evidence at trial was insufficient to sustain his convictions. Specifically, Defendant asserts that the State failed to prove the underlying felony convictions required to support his felony murder conviction. Defendant argues that the State failed to prove that he took or attempted to take the victim's property or that he entered the victim's habitation. The State responds that the evidence was sufficient to support Defendant's convictions.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012)

(quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005); *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *Hanson*, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)).

As relevant in this case, felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery, burglary [or] theft[.]" T.C.A. § 39-13-202(a)(2). The culpable mental state required for a felony murder conviction is the intent to commit the underlying felony, namely burglary, robbery and theft. T.C.A. § 39-13-202(b); *see Wagner*, 382 S.W.3d at 299.

Defendant was charged by presentment with three counts of felony murder: felony murder during the attempt to perpetrate a burglary, felony murder during the attempt to perpetrate a theft, and felony murder during the attempt to perpetrate a robbery.

Defendant argues that the proof at trial was insufficient to sustain his convictions for felony murder during the attempt to perpetrate burglary, especially aggravated burglary, and employment of a firearm during the commission of especially aggravated burglary because the State failed to prove that he actually entered the victim's habitation. A person commits burglary who, without the effective consent of the property owner . . . enters any freight or passenger car, automobile, truck, trailer, boat, airplane or other motor vehicle with intent to commit a felony, theft or assault or commits or attempts to commit a felony, theft or assault." T.C.A. § 39-14-402(a)(4). "Enter" means "[i]ntrusion

of any part of the body" or "intrusion of any object in physical contact with the body." T.C.A. § 39-14-402(b).

Ms. Whitsell testified that the victim opened his back door and encountered Defendant pointing a gun at him. She testified that the victim "grabbed the gun and tried to push [Defendant] out and they started fighting." The prosecutor asked Ms. Whitsell, "And his arm made it in[side]? And you're saying that [the victim] grabbed for the gun?" Ms. Whitsell answered, "He grabbed – reached for [the gun] and I think he grabbed [Defendant's] arm trying to push – push him out." The State argues that the jury could reasonably infer from this testimony that the victim's attempt to push Defendant "out" was necessary because either Defendant's gun or his hand had entered the victim's home. While it is a close question, we agree with the State that the evidence is legally sufficient to support the convictions of felony murder in the attempt to perpetrate burglary, especially aggravated burglary, and employment of a firearm during the commission of especially aggravated burglary pursuant to the cases cited above.

First, as to felony murder in the perpetration of attempted burglary (the indicted offense), even if assuming that the jury disregarded the circumstantial evidence that Defendant's arm holding the gun entered the house through the doorway, the remaining circumstantial evidence sustains the conviction. Defendant had taken every step necessary to at least prove an attempt to commit burglary. He was armed and had the intent to rob the victim using his displayed handgun. His intent was proven by Ms. Whitsell's and Ms. Kinser's testimony. When the victim opened the door, Defendant was caught at the entrance with his gun already pointed at the victim. The circumstances imply that Defendant, at most, was one step from entering the house. As to the other two challenged convictions, we feel that the testimony by Ms. Whitsell that the victim pushed Defendant "out" reasonably infers that some portion of Defendant's body had entered the home. Defendant is not entitled to relief as to this issue.

Defendant also argues that the evidence was insufficient to sustain his convictions for felony murder during the attempt to perpetrate theft, felony murder during the attempt to perpetrate robbery, and especially aggravated robbery because the State failed to prove that any property was taken from the victim or that Defendant attempted to take any property from the victim.

"Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. §39-13-401(a). Theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. T.C.A. § 39-14-103. A person commits criminal attempt when he acts with intent to complete a course of action that would constitute the offense, and the conduct

constitutes a substantial step toward the commission of the offense.  T.C.A. § 39-12-101(a)(3).

We conclude that the evidence, viewed in the light most favorable to the State, was sufficient for a rational trier of fact to find Defendant's conduct constituted the killing of the victim during the attempt to perpetrate a robbery.  The evidence showed that Defendant knew that Ms. Whitsell was going to the victim's home to purchase drugs.  On the way to the victim's apartment, Defendant asked Ms. Whitsell "how big" the victim was.  When they arrived, Ms. Whitsell directed Defendant to park on a street away from the victim's home and to stay in his car.  Defendant left his car and approached the victim's apartment.  When the victim opened his back door, he encountered Defendant pointing a gun at him.  Ms. Kinser testified that Defendant told her that he "hit a lick and it went sour," which Ms. Kinser testified meant that Defendant had committed a robbery.  Although the proof did not establish that Defendant took any property from the victim, the jury could reasonably infer from this evidence that Defendant followed Whitsell to the victim's apartment intending to deprive the victim of his property.  This same evidence was sufficient to sustain Defendant's convictions for felony murder during the attempt to perpetrate a theft and attempted especially aggravated robbery.  Defendant is not entitled to relief on this issue.

The record on appeal does not contain a judgment form for counts 2, 3, and 8.  In counts 2 and 3, Defendant was charged with felony murder during the attempt to perpetrate theft and felony murder during the attempt to perpetrate robbery.  The trial court properly merged Defendant's felony murder convictions into a single count in count 1.  Likewise, in counts 7 and 8, Defendant was charged with two separate unlawful possession of a weapon offenses, and the trial court properly merged the two counts into a single count.  However, when two or more jury verdicts are merged into single conviction, the court should complete a uniform judgment document for each count in order to "record the jury's disposition in each of the counts." *State v. Berry*, 503 S.W.3d 360 (Tenn. 2015).  Accordingly, we remand this case to the trial court for entry of a judgment of conviction in counts 2, 3, and 8 to reflect the jury verdict in those counts, and the judgments should indicate that the convictions merged with counts 1 and 7.  Additionally, the judgment of conviction in count 6 reflects that Defendant was charged with and convicted of possession of a firearm during the commission of a felony, a Class D felony, rather than employing a firearm during the commission of a felony, a Class C felony.  The indictment shows that Defendant was charged with employing a firearm during the commission of a dangerous felony.  On remand, the trial court should amend the judgment in count 6 to properly reflect the offense charged and the conviction offense.

CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court and remand this case for entry of judgments in all merged counts, as well as an amended judgment in count 6.

_____
THOMAS T. WOODALL, JUDGE